IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| EVELYN BIRCHFIELD, individually and as a representative of a class of similarly situated persons,<br><br>      Plaintiff,<br><br>v.<br><br>EMPOWER ADVISORY GROUP, LLC; EMPOWER RETIREMENT, LLC; EMPOWER FINANCIAL SERVICES, INC.; and EMPOWER ANNUITY INSURANCE COMPANY OF AMERICA,<br><br>      Defendants. | CIVIL ACTION NO.:1:22-cv-02716<br>_____<br><br>COMPLAINT – CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

## SUPERSEDING COMPLAINT

Plaintiff Evelyn Birchfield, on behalf of herself and as representative of a

proposed class of consumers who established so-called "Managed Account" IRAs

based on recommendations and/or advice from registered investment advisors with

Defendant Empower Advisory Group ("Empower"), bring this action against

Empower and its affiliates, Empower Retirement, LLC ("ERL"), Empower

Financial Services, Inc. ("EFS"), and Empower Annuity Insurance Company of

America[1] ("EAIC," and together with Empower, Empower Retirement, and EFS, "Defendants") for breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract, and other claims.

## NATURE OF THE CASE

1.      This case is about a fraudulent scheme whereby Empower and its affiliates targeted unsophisticated investors who Empower deceived into purchasing illusory "Managed Account" investment-advisory services in reliance on Empower's false representations that its recommendation that they purchase those services was the product of objective, individualized, fiduciary advice.

2.      In reality, despite explicit representations to the contrary, Empower's advice was conflicted—benefitting Empower, its advisors, and its affiliates in the form of multiple, above-market fees and kickbacks, all to the detriment of individuals who could have gotten cheaper investment products that performed just as well if they had actually received genuinely independent, fiduciary advice.

3.      Defendants are a group of related companies that provide investment and retirement services, including the investment-advisory services at issue in this case.

---

[1]      Until recently, Empower was called Advised Assets Group, LLC, EFS was called GWFS Equities, Inc., and EAIC was called Great-West Life & Annuity Insurance Company.

4.     Empower and its advisors are registered investment advisors with the Securities and Exchange Commission and are therefore subject to federal fiduciary standards that govern their conduct, including the advice they provide to customers to purchase investment-advisory services. *E.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 471 n.11 (1977) ("Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisors.").

5.     Likewise, Defendants represent themselves to the public as "customer obsessed," focused on "do[ing] the right thing," and "dedicated . . . to serving [their] customers."[2]

6.     Empower advisors tell customers a similar story. With lists of investment customers provided by ERL, they contact or schedule meetings with consumers during which they recommend the purchase of Empower's "Managed Account" investment-advisory services that will purportedly maximize a customer's investment returns.

7.     At the start of these discussions, Empower requires its advisors to tell customers that they are "Investment Advisers" acting on behalf of Empower as "a Registered Investment Adviser firm." Empower instructs its advisors to stress that they are acting in the customer's "best interests" and that they are "salaried" and "non-commissioned."

_____

[2]     https://www.empower.com/about/our-values (last visited on January 5, 2023).

8.     The process by which Empower advisors solicit customers to purchase Empower's Managed Account investment-advisory services is similarly designed to create an illusion of fiduciary objectivity. After asking a series of questions, advisors represent that they are inputting a customer's information into a proprietary software product designed by a third party (for many years, NASDAQ-traded investment research firm Morningstar, Inc.) that will generate a "personalized" investment solution tailored to the specific needs and goals of that customer.

9.     But all of this is a ruse. Empower's supposedly objective software tool only generates one recommendation: purchase Empower's Managed Account investment-advisory services. And Empower permits its advisors to make only one recommendation: purchase Empower's Managed Account investment-advisory services.

10.    Empower's Managed Account service is a fee-based discretionary trading account that Empower's advisors represent provides individualized investment advice and investment options customized to the needs of customers who purchase the service. But the Managed Account services is just as illusory as the process Empower's advisors follow to recommend it. Rather than the bespoke advice Empower promises, the Managed Account service simply slots customers into one of seven preset asset allocations.

11.     Moreover, despite their representations to the contrary, Empower advisors are in fact compensated based on how many customers they convince to purchase Managed Account services. Instead of providing best-interest advice as fiduciaries as they are legally obligated to do (and as they represent), these advisors are acting in the best interest of Empower, its affiliates and themselves.

12.     The reason Empower lies to get customers to purchase Managed Account services is perhaps not surprising: it profits handsomely from doing so.

13.     For the privilege of having a software program put their investments in one of seven boxes, class members pay Empower above-market management fees.

14.     And although Empower fails to disclose it beforehand, most of the underlying funds that Managed Account customers' assets will be invested in are offered by Empower's affiliate, EFS. So, when an Empower investment advisor convinces a customer to purchase Managed Account services, Empower and its affiliates "double dip" on fees: Empower charges an investment-advisory fee and Empower's sister companies charge fund fees for assets invested in individual funds. Combined, these fees can exceed well over 1% of the amounts a customer turns over to Empower when they purchase Managed Account investment-advisory services.

15.     As a direct result of this scheme, Defendants reaped massive,

unlawful profits at the expense of investors and retirees like Plaintiff who were lured into purchasing Empower Managed Account investment-advisory services, even though lower cost products—ones fiduciaries would be duty-bound to recommend—were readily available.

16.     Plaintiff brings this case on behalf of herself and similarly situated customers who Empower and its advisors misled into purchasing Empower Managed Account investment-advisory services.

## PARTIES

*Plaintiff*

17.     Plaintiff Evelyn Birchfield, a retired employee of the state of Alabama, had an account with ERL.

18.     Upon information and belief, ERL provided information about Ms. Birchfield (including her contact information and investment history) to representatives of Empower, based on a corporate policy designed, implemented, and overseen by (and which ultimately benefitted) EAIC.

19.     In August 2019, an Empower representative named Jennifer Leonard contacted Ms. Birchfield. Ms. Leonard indicated to Ms. Birchfield that she was an investment advisor and that she was providing advice in Ms. Birchfield's interest.

20.     Ms. Leonard recommended that Ms. Birchfield purchase Empower Managed Account investment-advisory services.

21.     Based on these representations, Ms. Birchfield purchased investment advisory services by placing her funds in an Empower Managed Account.

22.     Ms. Birchfield did not become aware of Empower's conflicts of interest, the fact that Ms. Leonard had made the misrepresentations described herein, that Empower had not provided the types of services it contracted to provide to her, or that Empower's affiliates had aided and abetted and profited from the scheme described herein until October 2022.

23.     Ms. Birchfield is a citizen of the state of Alabama.

*Defendants*

24.     Defendant Empower Advisory Group, LLC, formally known as Advised Assets Group, LLC, ("Empower") is an Oregon limited liability company. Empower's sole member/owner is EAIC, a corporation incorporated in Colorado with a principal place of business located in Greenwood Village, Colorado. Empower is therefore a citizen of the state of Colorado.

25.     Defendant Empower Retirement, LLC ("ERL") is a Colorado limited liability company whose sole member/owner is EAIC, a corporation incorporated in Colorado with a principal place of business located in Greenwood Village, Colorado. ERL is therefore a citizen of the state of Colorado.

26.     Defendant Empower Financial Services, Inc. ("EFS"), formerly GWFS Equities, Inc., is a corporation incorporated in Delaware with a principal

place of business in Colorado. EFS is therefore a citizen of the states of Delaware and Colorado.

27.     Defendant Empower Annuity Insurance Company of America ("EAIC"), formally known as Great-West Life & Annuity Insurance Company, is a corporation incorporated in Colorado with a principal place of business in Greenwood Village, Colorado.

## JURISDICTION AND VENUE

28.     This Court has original jurisdiction over the claims in this action under the provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d), (i) because the aggregate amount in controversy for the Class exceeds $5,000,000.00, exclusive of interest and costs; (ii) because there are more than 100 Class members nationwide; and (iii) because the majority of Plaintiff and Class members are citizens of a state different from Defendants. The aggregate amount in controversy for the Class exceeds $5,000,000.00 because, among other damages, the total amount of investment-advisory and fund fees Plaintiff is seeking as damages or to disgorge is significantly greater than that amount.

29.     This Court has personal jurisdiction over Defendants because (i) each Defendant does business in Colorado and has its principal place of business in Colorado; (ii) because Defendants have directed and implemented the scheme

alleged herein from Colorado; and (iii) because Defendants have obtained the benefits of the laws of the State of Colorado.

30.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because (i) Defendants are headquartered in and have their principal places of business in this District; (ii) Defendants intentionally and regularly conduct business in this District; and (iii) a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims herein occurred in this District.

31.    Additionally, venue is appropriate in this District because the contract Empower entered into with each member of the Class in connection with the Managed Account services that are the subject of this action provides that the "proper forum for any claim under this Agreement shall be . . . the United States District Court, District of Colorado." *See* Ex. 1 (copy of that contract) at 5.

## FACTUAL ALLEGATIONS

32.    EAIC is the parent company of Empower, EFSI, and ERL.

33.    ERL is the second-largest retirement plan provider in the United States.

34.    ERL provides deferred-compensation plans to state, federal, and local governments or agencies around the country and offers individual retirement accounts, commonly known as IRAs, to persons who are saving money for retirement.

35.    Because of the services it provides, ERL has direct access to contact

information, investment histories, and other valuable information about an enormous population of persons with funds to invest.

36.     To capitalize on this information, Defendants developed a scheme to leverage consumers' reliance on the fiduciary advice that a registered investment advisor is obligated by federal law to provide to drive customers from low-fee investment and retirement plans to Empower's higher-fee Managed Account service, which contains individual funds owned by Empower's sister companies, including EFS.

37.     Defendants use the detailed knowledge ERL has about investors on its platforms to develop target lists for Empower's investment advisors—customers nearing retirement or who have recently retired, customers with large account balances, and customers with investment histories that suggest a lack of sophistication.

38.     Under the guise of offering objective, fiduciary advice from a "Registered Investment Advisor," Empower's investment advisors use manipulative sales tactics and falsehoods to push customers into purchasing Managed Account investment advisory services and transferring their funds to Empower, without regard to whether that recommendation is in the customer's best interests.

39.     Among other deceptive tactics, Empower and its advisors:

a. misrepresent that Empower advisors are or were objective and disinterested fiduciaries providing recommendations that are in the best interest of the customer;

b. misrepresent that Empower advisors are or were salaried, non-commissioned, and financially disinterested in whether a customer purchases Empower's Managed Account investment-advisory services;

c. conceal that Empower's bonus and compensation structure create or created financial incentives for advisors to convince customers to purchase Managed Account services;

d. conceal that the Empower's Managed Account services charges higher fees and generates greater revenue for Empower and its affiliates than other lower-cost and readily available alternatives;

e. conceal that Empower's "proprietary software" and advisors only recommend that customers purchase Empower's Managed Account services;

f. conceal that a Managed Account and the funds in the Managed Account share common ownership and financial interest with Empower.

40.     As a result of this scheme, Defendants reap significant, unlawful profits at the expense of their customers, who Empower charges investment-advisory fees for illusory services and fund fees paid to the Empower affiliates that Empower has designed its Managed Account services to enrich.

41.     Empower's actions breached the contracts it entered into with Plaintiff and members of the Class, constituted fraud (and/or negligent misrepresentation), and violated the fiduciary duties that Empower owed to Plaintiff and members of the Class.

42.     ERL, EFS, EAIC facilitated, aided, abetted, and were unjustly enriched by Empower's malfeasance, including providing Empower with personal information about members of the Class to identify targets for Empower's deception and receiving fees from members of the Class that, had Empower acted in accordance with its fiduciary duties, would never have been paid.

**A. Aided by its affiliates, Empower induced Plaintiff and other customers to purchase Managed Account services based on a series of misrepresentations and in breach of Empower's fiduciary duties.**

43.     Since at least 2015, Defendants have utilized the scheme described herein to deceive retirement investors into purchasing investment advisory services by purchasing Empower Managed Account investment-advisory services based on false representations that an Empower advisor's recommendation that they do so constituted objective, fiduciary advice.

44.     Upon information and belief, ERL, under direction from EAIC, identifies certain of its customers as potential targets for enrolling in Managed Accounts based on the customers' age, employment status, and other personal information.

45.     Upon information and belief, ERL (under direction from EAIC) provides this personal information, along with contact information, to Empower, which then provides target lists to its advisors.

46.     Empower advisors then contact those customers under the guise of

providing advice to help maximize the value of those customers' retirement savings.

47.    Upon information and belief, what occurs during these conversations or meetings between Empower advisors and customers is uniform nationwide and materially the same as between customers in deferred-compensation plans and those in traditional IRAs. In many but not all instances, Empower calls these meetings or conversations "Retirement Readiness Reviews" ("RRRs"). Although not all meetings or conversations during which Empower and its advisors make the misrepresentations described in this complaint are formally called RRRs by Empower or its advisors, Plaintiff uses the term RRR in this complaint as a shorthand to describe all meetings and conversations during which Empower and its advisors makes the misrepresentations described in this complaint in order to convince members of the Class to purchase Empower's Managed Account investment-advisory services.

48.    In RRRs, Empower requires its advisors to emphasize that they are registered investment advisors, which means the advisors are providing independent, objective advice in the customer's best interest.

49.    The script Empower required its advisors to follow in RRRs required them to inform customers that they "may . . . act in the capacity of an Investment Advisor Representative of [Empower], which is a Registered Investment Adviser

firm."

50.     Empower also encouraged its advisors to emphasize (falsely) during RRRs that they had no financial incentive to recommend Managed Account services by indicating that they were salaried or non-commissioned.

51.     Empower makes this representation to the public as well. For example, Empower's government-markets division[3] indicates in marketing brochures provided to ERL deferred-compensation plan participants and others that its advisors are salaried, non-commissioned, and objective:

> *Your FBC Advisor is a salaried, noncommissioned professional with one goal: to help you to and through your never-ending summer ... retirement!*

*See, e.g.*, Sample of Empower Marketing Brochures, attached as Exhibit 2.

52.     But this assertion is false.

53.     Empower advisors receive financial incentives, bonuses, commissions, and/or other compensation based on the value of the assets that they

---

[3]     Advisors in Empower's government- markets division sell Managed Account services to employees of state, federal, and local governments or agencies enrolled in ERL deferred-compensation plans.

convince customers to convert into Managed Accounts (called assets-under-management, or "AUM").

54.     For example, advisors in Empower's government-markets division are directly compensated based on the AUM they convince customers to deposit into Managed Accounts. Specifically, between 25-35% of the annual bonuses that Empower advisors typically have received is based on the AUM transferred into Managed Accounts based on their RRRs.

55.     Empower also sets a hefty annual quota for Managed Account conversions. If an Empower advisor misses the quota, the advisor does not receive a bonus connected with his or her work in connection with recommending Managed Account services.

56.     In addition to financially incentivizing advisors to convert assets into Managed Accounts, Empower also imposes significant pressure on its advisors to sell Managed Accounts, including:

  a. routinely conducting mandatory training sessions to teach advisors how to sell Managed Accounts;

  b. conducting reviews of advisors' "sales pitches" and critiquing advisors —sometimes in front of other advisors—whose tactics Empower deems insufficiently aggressive in pushing customers to purchase Managed Account services;

  c. instructing advisors to identify customers' "pain points" for the purpose of pressuring them to purchase Managed Account services;

    d.   bombarding advisors with emails encouraging them to "sell sell sell" Managed Accounts;

    e.   emailing lists of advisors who convert large dollar amounts of AUM into Managed Accounts to all other advisors nationwide and lauding their accomplishments;

    f.   putting advisors on "Performance Improvement Plans" if they fail to convert sufficient numbers of accounts or AUM to Managed Accounts;

    g.   giving negative reviews to advisors who do not convince enough customers to purchase Managed Account services or who do not convert sufficient dollar amounts of AUM into Managed Accounts; and

    h.   terminating advisors who Empower deems not to have converted enough AUM into Managed Accounts.

57.    Empower also trains its advisors to represent that they are providing objective advice in the best interests of the customers they are advising—that is, that they are acting as fiduciaries.

58.    For example, Empower stressed in writing to its advisors the "critical" importance during RRRs of "set[ting] the expectation at the onset of discussion with the participant" that advisors would be "**giving them fiduciary, best interest advice tailored to their individual needs and HELPING THEM IMPLEMENT CHANGES that they may need to make.**"

59.    The analysis Empower advisors perform during RRRs is designed to convey the same impression of objectivity and best-interest, fiduciary advice.

60.     For example, during RRRs, Empower advisors ask customers a series
of "Probing Questions" designed, according to Empower, to identify the
customer's "pain points" and "landmines."

61.     These questions include:

a.   "What type of investment strategy do you employ?"

b.   "Do you know how or have the time to rebalance your account
     quarterly?"

c.   "How frequently do you monitor or change your investment
     allocation?"

d.   "How do you feel about investment fluctuations?"

e.   "Do you enjoy the responsibility of building and maintaining your
     own portfolio?"

f.   "Have you thought about lifestyle changes that you would make in
     retirement?"

g.   "Do you anticipate having to, or wanting to work during retirement?"
     and

h.   "How comfortable are you at creating your retirement strategy
     yourself?"

62.     In addition to causing customers concern that they are not equipped to
handle their own retirement investments, these questions are also purportedly to

gather information to permit the advisor to offer objective, individualized, fiduciary advice.

63.     Specifically, Empower advisors represent to customers that they are inputting the information they have gathered into Empower's "proprietary software" application to generate a personalized, objective recommendation purportedly in the customer's best interest—software Empower tells customers was created by third-party Morningstar, a nationally known third-party investment-analysis and financial-services firm.

64.     But despite the veneer of objectivity, the software only produces one recommendation—purchase Empower's Managed Account investment-advisory services.

65.     After the software inevitably generates the only option it is designed to generate—that the customer purchase Empower's Managed Account services—Empower then requires its advisors to then "communicat[e] the advice . . . generated by Morningstar."

66.     But like the software, Empower's advisors are only ever permitted to make one recommendation—purchase Empower's Managed Account investment-advisory services by investing the customer's funds in an Empower Managed Account.

67.     Empower does not disclose—and in fact actively conceals—that its

proprietary software and advisors are only permitted to make a single recommendation—that the customer purchase Empower's Managed Account investment-advisory services.

### B. Empower enters into materially uniform contracts with customers who purchase its Managed Accounts services.

68.    When a customer accepts the advice of an Empower advisor and purchases advisory services by signing up for a Managed Account, they enter into a contractual relationship with Empower.

69.    Upon information and belief, the contracts Empower entered with Plaintiff and members of the putative Class defined below were, in all material respects, uniform. A copy of an example of these uniform contracts (hereinafter, the "Agreement") is attached hereto as Exhibit 1.

70.    In the "Agreement, Empower explicitly "acknowledges that, as a registered investment adviser, it owes a fiduciary duty to participants with respect to the advice it provides." Ex. 1, at 3.

71.    The Agreement also reiterates that the Managed Account service Empower misleads customers into purchasing supposedly provides "a personalized investment portfolio" tailored to the needs of the customer. Specifically, in the Agreement's "Description of Services," Empower states:

Managed Account: The Managed Account service is geared toward users who wish to have investment professionals select among the available investment options and manage their retirement accounts for them. You will receive a personalized investment portfolio that reflects your investment options and your retirement timeframe, life stages and overall financial picture, including assets held outside your account (if you elect to provide this information), which may be taken into consideration when determining the allocation of assets in your account. Generally, AAG will not provide advice for, recommend allocations of, or manage your outside accounts.

Under the Managed Account service, AAG has discretionary authority over allocating your assets among the core investment options without your prior approval of each transaction. AAG is not responsible for either the selection or maintenance of the investment options available within your retirement account or IRA. If available in your account, AAG will not provide advice for, or recommend allocations of, individual stocks (including employer stock), self-directed brokerage accounts, guaranteed certificate funds, employer-directed monies, or any other investment options that do not satisfy the methodology requirements of the IFE, even if they are available for investment in the plan. Your balances in any of these investment options or vehicles may be liquidated, subject to your plan's and/or investment provider's restrictions.

*Id.* at 1.

72.     As this passage from the Agreement reflects, when a customer purchases Empower's Managed Account service, they give Empower "discretionary authority over allocating [their] assets . . . without [the customer's] prior approval for each transaction." *Id.*

73.     Underscoring the supposedly "personalized" service, Empower promises in the Agreement that "Managed Account assets" will be "monitored, rebalanced and reallocated periodically (approximately quarterly) by [Empower]." *Id.*

74.     The Agreement also promises that investments in a Managed Account will be based on the same purportedly disinterested, non-conflicted recommendations that Empower advisers use to mislead customers into purchasing Managed Account services in the first place—Empower's proprietary Morningstar product.

**Methodology:** The Advisory Services methodology is powered by Morningstar Investment Management. Morningstar Investment Management first builds stable, consistent asset allocation models at various risk levels. Based on Monte Carlo simulations of the user's resources, liabilities, and human capital, an appropriate asset level portfolio is selected and a savings rate and retirement age are determined that best suits each user's situation. The asset class level model portfolios are revisited annually. Investment options from the account's menu are then selected to implement each asset-level model portfolio. These investment options are monitored and rebalanced periodically (approximately quarterly).

*Id.* at 2.

75.   The Agreement acknowledges that "Managed Account services may have allocations that result in [EFS] receiving compensation from the investment options"—*i.e.*, that some of the underlying funds Empower will use its discretionary authority to invest Managed Account customers' assets in will result in fees being paid to Empower's affiliate. *Id.*

76.   But Empower asserts in the Agreement that it "does not believe there is a conflict of interest" because "[t]he compensation paid by [Empower] to Morningstar Investment Management for [its] proprietary software advice program does not vary based on the allocations made" and "[b]ecause Morningstar Investment Management is unaffiliated with [Empower] and [EFS] . . . ." *Id.*

77.   But this purported disclaimer does not address the inherent conflict between Empower itself exercising its discretionary authority to move assets into funds that will result in its affiliates taking fees from members of the Class.

78.   Nor does this disclaimer address the inherent conflict that exists because Empower limits the possible investment options in the limited set of seven asset allocations into which Managed Account customers' funds may be allocated

to primarily include funds that result in its affiliates taking fees from members of the Class.

79.     The Agreement also provides that it is "entered into in Denver, Colorado and [is] governed by and construed in accordance with the laws of the State of Colorado, without regard to its conflict of law provisions." *Id.* at 3.

### C. By misleading customers to purchase Managed Account services, Empower enriched itself and its affiliates at the expense of its customers.

80.     Empower's self-serving contractual representation that there is no conflict of interest because of its relationship to Morningstar is a red-herring: the conflict exists because Empower and its advisors only recommend services that benefit Empower and its affiliates, including EFS and EAIC.

81.     While requiring its advisors to represent that they are providing objective advice in the best interests of the customer, Empower disallows its advisors from recommending any investment other than Empower Managed Accounts—even though Empower and its advisors owe heightened fiduciary duties to the customers, including as a result of their status as registered investment advisors.

82.     By recommending that customers purchase Managed Account services—indeed, making *only* that recommendation—Empower enriches itself, its advisors, and its affiliates.

83.     First, Empower pays itself a "Investment Advisory Fee" for the privilege of using its Managed Account investment advisory services.

84.     The Investment Advisory Fee is calculated as a percentage of the AUM that a Class member who purchases Managed Account services deposits into the Managed Account.

85.     For example, the fee schedule incorporated into Agreement provides that Empower will pay itself an Investment Advisory Fee equal to nearly half a percent of the AUM the customer deposits into the Managed Account:

| My Total Retirement Participant Account Balance | Quarterly Fee | Annual Fee |
|---|---|---|
| ≤ $100,000.00 | 0.1125% | 0.45% |
| Next $150,000.00 | 0.0875% | 0.35% |
| Next $150,000.00 | 0.0625% | 0.25% |
| > $400,000.01 | 0.0375% | 0.15% |

*Id.* at 6.

86.     Upon information and belief, the Investment Advisory Fee that Empower charges nationwide for its Managed Account service across all of its divisions are at least this high or higher.

87.     As noted above, Empower pays itself this sizable fee purportedly for the personalized investment advice it promises both before and when a customer purchases Managed Account services.

88.     But upon information and belief, Empower does not provide individualized investment advice for those who purchase Managed Account

- 23 -

services.

89.     Instead, Empower's Managed Account service simply uses a software program to automatically assign customers to one of just seven preset asset allocations.

90.     Second, as noted above, Empower also financially incentivizes its advisors to aggressively sell its Managed Account service by providing them financial incentives, bonuses, commissions, and other compensation based upon the value of the AUM they convince customers to move into Managed Accounts.

91.     Finally, not only does Empower pay itself an Investment Advisory Fee, it also facilitates its affiliates to double-dip by taking fees associated with the various individual funds that the Managed Account holds.

92.     Specifically, when a customer puts her assets into a Managed Account, Empower uses those dollars to purchase a basket of individual funds that mirror investments in the broader market, like the S&P 500, government bonds, or money market.

93.     Those funds are paid "Fund Fees" to administer the product they provide.

94.     Many—and, for most of the pre-set allocations, *all*—of the individual funds that Empower uses a Managed Account customer's fund assets to purchase are directly or indirectly owned by Empower's affiliates, including (upon

information and belief) EFS and/or EAIC.

95.    Those affiliates, including (upon information and belief) EFS and/or

EAIC, are therefore paid (directly or indirectly) Fund Fees.

96.    These Fund Fees paid to Empower's affiliates can cost customers an

additional 80 basis points (0.8%) or more of the AUM they put into their Managed

Accounts—an amount in addition to the 45 basis points (0.45%) or more the

customer already pays Empower for the Investment Advisory Fee.

97.    In other words, customers whom Empower misleads into purchasing

Managed Account services ultimately pay Empower and its affiliates up to 1.35%

or higher of the AUM they deposit into their Managed Accounts when they

purchase Managed Account services, all for the benefit of having a computer slot

them into one of seven pre-set allocations (a fact not disclosed to them when they

agree to purchase those services).

98.    The fact that many—and in most cases all—of the funds available to

customers if they purchase Managed Account services are Empower-affiliated is not

disclosed to customers before they purchase Managed Account services either.

## CLASS ALLEGATIONS

99.    Plaintiff seeks to certify, and to be appointed as representative of, the

following Class:

All individuals who purchased Empower Managed Account advisory

services and transferred funds from an IRA, government-sponsored deferred-compensation, or other non-ERISA-governed investment account into an Empower Managed Account from October 14, 2012 through the present.

100.   Excluded from the Class are Defendants, Defendants' subsidiaries and affiliates, and their officers, directors, and members of their immediate families, as well as the legal representatives, heirs, successors, or assigns of any such excluded party; all consumers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, their immediate family members, and chambers staff.

101.   Plaintiff reserves the right to modify or amend the definition of the Class and/or add Subclass(es) before the Court determines whether certification is appropriate.

102.   The Class meets the criteria for certification under Rules 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

103.   **Numerosity:** Class members are too numerous to feasibly be joined in a single lawsuit given that the Class likely consists of (at least) tens of thousands of individuals who purchased Managed Account services from Empower.

104.   The exact number and identities of the members of the proposed Class are unknown at this time, are within the exclusive knowledge of Defendants, and can be ascertained through Defendants' computer systems. Defendants have the

administrative capacity through their computer systems and other records to identify all members of the Class, and such information is not otherwise available to Plaintiff and the Class.

105. **Commonality and Predominance**: Common questions of fact and law exist with respect to all Class members and predominate over any questions affecting only individual members. The common questions include, for example (and without limitation):

a. whether Empower engaged in a scheme to deceive Plaintiff and members of the Class into purchasing investment advisory services based on false representations that an Empower advisor's recommendation that they do so constituted objective, fiduciary advice;

b. regarding whether Empower owed fiduciary duties to Plaintiff and members of the Class, including as a result of its and its advisors' status as registered investment advisors;

c. whether Empower breached its fiduciary duties to Plaintiff and members of the Class;

d. whether Empower defrauded Plaintiff and members of the Class by making misrepresentations regarding and/or failing to disclose material information related to direct or indirect financial incentives,

bonuses, commissions, and other compensation it paid to its advisors linked to Class members purchasing Managed Account services;

e. whether Empower defrauded Plaintiff and members of the Class by making misrepresentations regarding and/or failing to disclose material information related to the available investments options its advisors were permitted to recommend to members of the Class;

f. whether Empower defrauded Plaintiff and members of the Class by providing false descriptions of and/or failing to disclose material information regarding what its Managed Account service entailed;

g. whether Plaintiff and members of the Class reasonably relied to their detriment on the fraudulent statements and/or omissions made by Empower and its advisors and/or whether a presumption of reliance should be applied;

h. whether Plaintiff and members of the Class have sustained harm as a result of Empower's fraud and/or breach of fiduciary duty and if so, the appropriate amount of damages and/or equitable relief (including disgorgement) necessary to remedy that harm;

i. whether EIAC, EFL, and/or ERS aided and abetted Empower's fraud and/or breach of fiduciary duty to members of the Class;

j. whether Empower entered into materially uniform contracts with

members of the Class;

k. whether Empower breached the contracts it had with members of the
   Class who purchased Managed Account services;

l. whether, and in what amount, Empower's breach of its contracts with
   members of the Class caused damages to Plaintiff and members of the
   Class;

m. whether Empower, EAIC, and/or EFL were unjustly enriched at
   expense of members of the Class;

n. the appropriate measure of damages and/or equitable relief due to
   Class members; and

o. whether Plaintiff and the Class members are entitled to attorneys' fees
   and costs.

106.    **Typicality**: Plaintiff's claims are typical of the claims of other Class
members, as all members of the Class, including Plaintiff, were induced to
purchase the same Managed Account services based on the same
misrepresentations, entered uniform contracts with Empower, and were harmed by
Defendants' actions in the same way.

107.    **Adequacy**: Plaintiff will fairly and adequately represent the interests
of the Class. Plaintiff has no conflicts with any other member of the Class. Plaintiff
has retained counsel who are competent and have experience in prosecuting

complex class-actions, consumer-protection lawsuits, and litigation involving malfeasance related to investment advisory services.

108.   **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and members of the putative Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Given that there are at least tens of thousands of members of the putative Cass, even if all Class members could afford litigation, the court system could not. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

109.   Further, prosecution of separate actions by individual members would create the risk (A) of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties and liability, and (B) that adjudications of individual

members' claims may, as a practical matter, be dispositive of the interests of other members not party to the adjudication or could substantially impair or impede those absent members' ability to protect their interests.

110.   Defendants also acted or failed to act on grounds generally and equally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the Class as a whole appropriate. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that could establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications which would be dispositive of the interests of other Class members and/or impair their interests.

## CAUSES OF ACTION

### COUNT ONE: Breach of Fiduciary Duty
### (against Empower)

111.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein.

112.   Empower owes fiduciary duties to customers who receive recommendations from its advisors to purchase its Managed Account services.

113.   Empower is a registered investment advisor.

114.   Empower advisors are also registered investment advisors.

115.   In communications with customers, Empower states that it is a registered investment advisor and that its advisors are acting as registered investment advisors on its behalf.

116.   These communications include direct communications with customers for the purposes of selling Empower's Managed Account services, including RRRs.

117.   During RRRs, Empower requires its advisors to state that they are "act[ing] in the capacity of an Investment Advisor Representative of [Empower], which is a Registered Investment Adviser firm."

118.   During RRRs, Empower advisors represent to customers that they are providing advice that is in the best interest of the customer.

119.   Empower advisors represent that the recommendations they make during RRRs are designed to maximize returns for customers.

120.   Empower advisors represent that they are salaried, non-commissioned, and/or otherwise not financially incentivized to make any particular recommendation.

121.   When a customer agrees to purchase Empower's Managed Account services, Empower holds their assets in a discretionary trading account.

122.    When a customer agrees to purchase Empower's Managed Account services, they agree to a contract with Empower that provides Empower has "discretionary authority over allocation your assets . . . ." Ex. 1 at 1.

123.    And in the contract a customer agrees to when they purchase Empower's Managed Account services, Empower "acknowledges that, as a registered investment adviser, it owes a fiduciary duty to participants with respect to the investment advice it provides . . . ." *Id.*

124.    Plaintiff and members of the Class reasonably placed their trust in Empower based on Empower's and its advisors' representations that Empower and its advisors were acting in their best interests.

125.    The facts described above resulted in a fiduciary relationship between Plaintiff and members of the Class, on the one hand, and Empower on the other.

126.    As a result of this fiduciary relationship, Empower and its advisors (acting on Empower's direction and control and for the benefit of Empower) owed Plaintiff and members of the Class fiduciary duties of good faith, fair dealing, loyalty, and care, and were obliged to act in their best interests, including avoiding self-dealing and making recommendations that would maximize the value of Plaintiff's and the Class members' investments and avoid unnecessary costs.

127.    In breach of these fiduciary obligations, Empower (and its advisors) engaged in self-dealing and made recommendations to Plaintiff and members of

the Class that were not in their best interests, including by recommending that they purchase Empower's Managed Account services, which resulted in Empower paying itself investment advisory fees and Empower's affiliates (including EFS and EAIC) taking fees associated with the underlying funds Empower purchased with funds deposited into Class members' Managed Accounts.

128.   As a direct and proximate result of Empower's breach of its fiduciary duties, Plaintiff and the members of the Class suffered damages, including (but not limited to) the value of the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

129.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging Empower of all investment-advisory fees paid by Plaintiff and members of the Class to Empower and fund fees paid to Empower's affiliates.

130.   Additionally, Empower's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury.

### COUNT TWO: Aiding and Abetting Breach of Fiduciary Duty
### (against ERL and EAIC)

131.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 130 as if they were fully set forth herein.

132.   Defendants ERL and EAIC aided and abetted Empower's breach of its fiduciary duties to Plaintiff and members of the Class.

133.   With knowledge of the scheme described above, ERL provided personal information about its customers—including Plaintiff and members of the Class—knowing that Empower would utilize that information to contact individuals and pressure them into purchasing Empower's Managed Account services in violation of Empower's fiduciary obligations to those individuals.

134.   ERL's provision of the personal information of Plaintiff and members of the Class to Empower so that Empower could convince them to purchase Managed Account services that would benefit Empower and its affiliates to their detriment substantially assisted Empower in its breach of its fiduciary duties.

135.   EAIC, as the sole owner of both ERL and Empower, facilitated and directed the exchange of customer information from ERL to Empower, Empower's misleading and false statements to customers, and Empower's scheme to utilize the assets of customers who agreed to purchase Managed Account services to benefit itself and its affiliates through conflicted investment-advisory and fund fees to the detriment of Plaintiff and members of the Class.

136.   EAIC knew that Empower's conduct would breach fiduciary duties that Empower owed to Plaintiff and members of the Class and EAIC provided

substantial assistance to Empower by designing and directing the implementation of the scheme that permitted those breaches of Empower's fiduciary duties.

137.   EAIC and ERL's aiding and abetting of ERL's breach of its fiduciary duties to Plaintiff and members of the Class caused damages to Plaintiff and the members of the Class, including (but not limited to) the value of the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

138.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging ERL and EAIC of any fees paid to them (directly or indirectly) by Empower from assets Plaintiff and members of the Class deposited into Managed Accounts.

139.   Additionally, ERL's and EAIC's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury.

## COUNT THREE: Fraudulent Misrepresentation
### (against Empower)

140.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein.

141.   In communications with Plaintiff and members of the Class—including during RRRs—Empower and its advisors acting as its agents made

fraudulent misrepresentations to Plaintiff and members of the Class regarding the advice they provided to purchase Empower Managed Account services, the nature of the Managed Account services, and the conflicted nature of the advice they provided.

142.   Among other false and misleading representations, Empower and its advisors acting as its agents represented that they were providing "fiduciary, best interest advice tailored to the[] individual needs" of each member of the Class. This representation was false because Empower only permits its advisors to recommend one course of action that is in the interest of Empower and its affiliates, not the best interest Plaintiff and the Class members—purchasing Empower Managed Account services, which resulted in the payment of conflicted investment-advisory fees to Empower itself and conflicted fund fees to Empower's affiliates.

143.   Empower and its advisors acting as its agents also falsely represented—both in writing and in oral communications with Plaintiff and members of the Class—that Empower advisors were "non-commissioned" and "salaried." That representation was false because Empower advisors in fact are given financial incentives bonuses, commissions, and other compensation linked directly or indirectly to the value of the AUM they convinced members of the Class to convert into Managed Accounts in connection with their purchase of

Empower Managed Account services. This representation was also materially misleading because it implied that Empower advisors were objective, unbiased, and acting in the best interests of Plaintiff and members of the Class, when in reality they were acting in the interests of themselves, Empower, and its affiliates.

144.   Empower and its advisors acting as its agents also falsely represented during RRRs that they were inputting an individual's personal and financial information into a proprietary software program in order to generate a personalized, objective recommendation. This representation was false because, in reality, the advisor was only permitted to make (and the software only ever generated) a single recommendation—purchase Empower Managed Account services, which enriched Empower and its affiliates to the detriment of Plaintiff and members of the Class.

145.   Empower and its advisors acting as its agents also falsely represented, including during RRRs, that when a customer purchased Managed Account services, Empower would provide a personalized investment allocation tailormade to that customer's needs. This representation was false because, in fact, Empower's Managed Account service only has seven preset asset allocations to which Plaintiff and members of the Class are assigned.

146.   These misrepresentations to Plaintiff and members of the Class during RRRs and similar conversations between Plaintiff and members of the Class and Empower and its advisors were, in fact, false.

147.   When Empower and its advisors acting as its agents made these misrepresentations, they knew the representations to be false or acted with at least reckless disregard to the truth or falsity of these representations.

148.   These misrepresentations were made by Empower and its advisors acting as its agents with the intent of defrauding and deceiving the Plaintiff and members of the Class in order to induce them to purchase Managed Account services from Empower.

149.   Plaintiff and members of the Class had a right to rely upon (or were justified in relying upon) the falsehoods and misrepresentations made by Empower and its advisors. Among other things, Empower and its advisors held themselves out to Plaintiff and members of the Class as trusted fiduciaries with superior knowledge and skill with respect to the Managed Account services they recommended that Plaintiff and members of the Class purchase.

150.   Plaintiff and members of the Class did in fact rely upon these false statements and misrepresentations in deciding to purchase Managed Account services from Empower to their detriment and to the benefit of Empower and its advisors.

151.   In the alternative, Plaintiff and the members of the Class should be presumed to have relied upon these false statements and misrepresentations made by Empower in deciding to purchase Managed Account services from Empower to their detriment and to the benefit of Empower and its advisors.

152.   As a direct and proximate result of their reliance upon these false statements and misrepresentations made, Plaintiff and the members of the Class suffered damages, including (but not limited to) the value of the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

153.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging Empower of all investment-advisory fees paid by Plaintiff and members of the Class to Empower and fund fees paid to Empower's affiliates.

154.   As an example of Empower's fraudulent misrepresentation, between August 1st and 21st of 2019, Ms. Birchfield received a telephone call from Empower registered investment advisor Jennifer Leonard (whose CRD registration number with the Securities and Exchange Commission is 4329671) during which Ms. Leonard, on information and belief and pursuant to Empower's standard policy, represented herself as a registered investment advisor acting on behalf of registered investment advisor Empower; stated that she was making an investment recommendation in Plaintiff's best interest that Plaintiff purchase Managed

Account services from Empower; and stated that investments advisors like herself would make better investment decisions for Ms. Birchfield.[4]

155.   These statements and representations by Ms. Leonard were false and she knew them to be false at the time she made them to Ms. Birchfield.

156.   Ms. Leonard made these false and misleading statements to Ms. Birchfield with the intent that she rely upon them to her detriment by purchasing Managed Account services from Empower.

157.   In reasonable and justified reliance upon Ms. Leonard's misrepresentations, Ms. Birchfield purchased Managed Account services from Empower.

158.   As a result of her reasonable reliance upon these false statements, Ms. Birchfield suffered damages, including (but not limited to) all investment-advisory fees and fund fees she paid to Empower and its affiliates.

159.   Additionally, Empower's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury.

---

[4]   Ms. Leonard also failed to disclose that she was compensated for enrolling Ms. Birchfield into the Managed Account and that the only investment recommendation she was authorized to make was the Managed Account.

## COUNT FOUR: Fraudulent Omission
### (against Empower)

160.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein.

161.    Empower and its advisors failed to disclose material facts that they had a duty to disclose with the intent to induce Plaintiff and members of the Class to take action to their detriment and to Empower's benefit—namely, purchasing Managed Account services. These false and materially misleading omissions include:

    a.  Failing to adequately disclose the conflicts of interest Empower and its advisers have to recommend Empower Managed Account services, including the fees, financial incentives, bonuses, commissions, and other compensation that Empower, its advisors, and its affiliates take from customers when they purchase Empower Managed Account services. This omission is materially misleading because it implies that Empower and its advisors are providing objective, unbiased, non-conflicted, recommendations and acting in the best interests of Plaintiff and members of the Class (as they are legally obligated to do), when in fact advisors are acting in the best interests of themselves, their employer Empower, and Empower's affiliates.

    b.  Failing to disclose that Empower advisors and its software program

only ever recommend that customers purchase Managed Account services. This omission is materially misleading because Plaintiff and other customers were led to believe that Empower utilized an objective, third-party, proprietary software application to make a personalized recommendation when in reality that process was a farce that led only to a single result—recommending the purchase of Managed Account services from Empower, which enriched Empower and its affiliates to the detriment of Plaintiff and members of the Class.

c. Failing to adequately disclose that, when a customer purchases Managed Account services from Empower, Empower slots the funds those customers invest into one of seven preset asset allocations, most of which are comprised in whole or in part of funds owned by Empower affiliates. This omission is misleading because customers reasonably believe that Empower advisors are providing personalized advice that is in their best interests when, in reality, Empower is benefitting itself and its affiliates to their detriment.

162.   Empower and its advisors failed to disclose these facts knowing that they were necessary to Plaintiff's and Class members' understanding of the recommendations Empower and its advisors made.

163.   Empower and its advisors held themselves out to Plaintiff and the Class as trusted fiduciaries with superior knowledge and skill with respect to the Managed Account services they recommended that Plaintiff and members of the Class purchase, and Plaintiff and Class members reasonably understood Empower and its advisors to be providing such disinterested, fiduciary advice.

164.   Empower and its advisors therefore had a duty to disclose the facts outlined above to Plaintiff and members of the Class.

165.   Empower and its advisors failed to disclose these facts to Plaintiff and members of the Class with the intent to induce them to take a course of action they would not otherwise have taken—namely, to purchase Empower's Managed Account services.

166.   Plaintiff and members of the Class justifiably relied upon incomplete representations that omitted these material facts to their detriment.

167.   In the alternative, Plaintiff and the members of the Class should be presumed to have relied upon incomplete representations that omitted these material facts to their detriment.

168.   As a direct and proximate result of their justifiable reliance upon Empower's and its advisor's omission of material facts, Plaintiff and the members of the Class suffered damages, including (but not limited to) the value of the

conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

169.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging Empower of all investment-advisory fees paid by Plaintiff and members of the Class to Empower and fund fees paid to Empower's affiliates.

170.   As an example of Empower's fraudulent omissions, in August 2019, Plaintiff Birchfield received a telephone call from Empower registered investment advisor Jennifer Leonard during which Ms. Leonard (i) failed to disclose the conflicted financial incentives she, Empower, and Empower's affiliates had; (ii) failed to disclose that her advice was not in Ms. Birchfield's best interest but was instead designed to enrich herself, Empower, and Empower's affiliates; and (iii) failed to disclose that Ms. Birchfield would not be provided a personalized investment portfolio but that would instead by slotted into one of seven preset asset allocations when she purchased Empower's Managed Account services.

171.   Ms. Leonard knew that the facts she omitted were necessary for Ms. Birchfield to understand the recommendations Ms. Leonard made.

172.   Ms. Leonard also knew that she was holding herself out as a trusted advisor with superior knowledge and skill with respect to the Managed Account services that she recommended Ms. Birchfield purchase and that Ms. Birchfield would rely upon the purported objective, fiduciary nature of her recommendations.

173.   Ms. Leonard therefore had a duty to disclose the facts she omitted.

174.   Ms. Leonard failed to disclose the material facts described above with the intent to induce Ms. Birchfield to take a course of action she would not otherwise have taken—namely, to purchase Empower's Managed Account services.

175.   Ms. Birchfield justifiably relied upon Ms. Leonard's incomplete representations omitting these material facts in deciding to purchase Managed Account services from Empower, which directly and proximately caused damages to her.

176.   Additionally, Empower's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury.

**COUNT FIVE: Negligent Misrepresentation
(against Empower)**

177.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein.

178.   Acting in the course of their business, profession, and employment, Empower and its advisors negligently made multiple misrepresentations and omissions of material fact to Plaintiff and the members of the Class without taking reasonable care to ensure the truth of their assertions and with knowledge that

Plaintiff the Class members would rely on their false or incomplete representations.

179.    Specifically, Empower and its advisors acting on behalf of and under the direction and control of Empower and in the scope of their employment with Empower:

a.    Represented that they were providing "fiduciary, best interest advice tailored to the[] individual needs" of each member of the Class. This representation was false because Empower advisors only recommend one course of action that is in the best interest of Empower and its affiliates, not Plaintiff and the Class members—namely, to purchase Empower Managed Account services, which results in the payment of a conflicted management fee to Empower and conflicted fund fees to Empower's affiliates.

b.    Represented that Empower advisors are "non-commissioned" and/or "salaried." This representation was false because Empower advisors in fact received payments in the form of financial incentives, bonuses, commissions, and other compensation that were linked directly or indirectly to the value of the AUM convinced members of the Class to convert into Managed Accounts. This representation was also materially misleading because it implied that Empower advisors were

objective, unbiased, and acting in the best interests of Plaintiff and members of the Class, when they were in fact acting in the best interests of themselves, Empower, and its affiliates.

c.  Represented that they provided a personalized, objective recommendation to purchase Empower's Managed Account services. This representation was false because Empower Advisors were only permitted to make and Empower's software only ever generated a single recommendation—to purchase Empower Managed Account services, which enriched Empower and its affiliates to the detriment of Plaintiff and members of the Class.

d.  Represented to Plaintiff and the members of the Class that, when a customer purchases Managed Account services, Empower provides a personalized investment allocation tailormade to that customer's needs. This representation is false because, in fact, Empower's Managed Account service only has seven preset asset allocations to which Plaintiff and members of the Class are assigned by a computer program.

e.  Failed to adequately disclose the conflicted fees, financial incentives, bonuses, commissions, and other compensation for Empower, its advisor, and its affiliates when customers purchased Empower

Managed Account services. This omission is materially misleading because it implies that Empower and its advisors are providing objective, unbiased, non-conflicted recommendations and acting in the best interests of Plaintiff and members of the Class (as they are legally obligated to do), when in reality they are acting in the best interests of Empower, its advisors, and its affiliates.

f.  Failed to adequately that Empower advisors and its software program only ever recommend that customers purchase Managed Account services. This omission is materially misleading because Plaintiff and other customers were led to believe that Empower utilized an objective, third-party, proprietary software application to make a personalized recommendation when in reality that process was a farce that led only to a single result—recommending the purchase of Managed Account services from Empower, which enriched Empower and its affiliates to the detriment of Plaintiff and members of the Class.

g.  Failed to adequately disclose that, when a customer purchases Managed Account services from Empower, Empower slots the funds those customers invest into one of seven preset asset allocations, most of which are made up in whole or in part by funds owned by

Empower affiliates. This omission is misleading because Plaintiff and
members of the Class reasonably believed that Empower advisors
were providing personalized advice in their best interests when, in
reality, Empower was benefitting itself and its affiliates.

180.   The aforementioned misrepresentations and material omissions were
false and misleading or made the representation made by Empower and its advisors
false and misleading.

181.   Empower and its advisors made these misrepresentations and material
omissions without reasonable care and negligently disregarded whether the
statements they made were true or false or materially misleading.

182.   Empower and its advisors made these misrepresentations and material
omissions in the context of providing investment advice and in their capacity as
registered investment advisors purporting to provide guidance to Plaintiff and
members of the Class in their business transactions—specifically, the purchase of
investment advisory services.

183.   Empower and its advisors knew that Plaintiff and members of the
Class would rely upon their representations with respect to their purchases of
Managed Account services from Empower.

184.   Plaintiff and members of the Class justifiably relied on these false and materially misleading misrepresentations and omissions to their detriment by purchasing Managed Account services from Empower.

185.   In the alternative, Plaintiff and the members of the Class should be presumed to have relied upon the false statements, misrepresentations, and material omissions made by Empower and its advisors in deciding to purchase Managed Account services from Empower.

186.   As a direct and proximate result of the negligence of Empower and its advisors, Plaintiff and the members of the Class suffered damages including (but not limited to) the value of the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

187.   Additionally, Empower's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury.

**COUNT SIX: Aiding and Abetting Fraud / Negligent Misrepresentation (against ERL and EAIC)**

188.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 and 140 through 187 as if they were fully set forth herein.

189.   Defendants ERL and EAIC aided and abetted Empower's fraud and/or negligent misrepresentations to Plaintiff and members of the Class.

190.   With knowledge of the scheme described above, ERL provided personal information about its customers knowing that Empower would utilize that information to contact Plaintiff and members of the Class and pressure them into purchasing Empower Managed Account services by making the false and misleading statements and omissions described above and that Plaintiff and members of the Class would justifiably rely upon those false statements and misleading omissions to their detriment.

191.   ERL's provision of Plaintiff's and Class members' personal information substantially assisted Empower in its fraud and/or negligent misrepresentation because Empower was able to use that information to identify suitable "targets" to mislead into purchasing Managed Account services to its and its affiliates benefit and to the detriment of Plaintiff and members of the Class.

192.   EAIC as the sole owner of both ERL and Empower facilitated and directed the exchange of customer personal information from ERL to Empower.

193.   EAIC also facilitated and directed Empower's misleading and false statements to customers and Empower's scheme to utilize the assets of customers who agreed to purchase Managed Account services to benefit itself and its affiliates through conflicted investment-advisory fees and fund fees.

194.   EAIC knew that Empower would mislead Plaintiff and members of the Class by making false or misleading statements that constituted fraud or

negligent misrepresentation and provided substantial assistance to Empower by designing, facilitating, and directing the implementation of the scheme that culminated in Empower's fraud and/or negligent misrepresentation.

195.   EAIC and ERL's aiding and abetting of ERL's fraud and/or negligent misrepresentation caused damages to Plaintiff and the members of the Class, including (but not limited to) the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

196.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging EAIC and ERL of any benefit they received from Plaintiff and members of the Class, including any investment-advisory fees or fund fees.

197.   Additionally, ERL's and EAIC's misconduct reflects fraud, malice, and/or willful misconduct sufficient to warrant the imposition of exemplary or punitive damages in an amount to be established by the jury

## COUNT SEVEN: Breach of Contract
### (against Empower)

198.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein.

199.   Empower entered into contracts with Plaintiff and with each member of the Class—collectively referred to in this complaint as the Agreement—related

to the Managed Account investment advisory services Plaintiff and each member of the Class purchased and which are described in this Complaint.

200.   Upon information and belief, the terms of the Agreement between Empower and Plaintiff and Empower and each member of the Class were uniform.

201.   Each Class member's Agreement with Empower is valid and binding.

202.   Upon information and belief, the material terms reflected in the copy of the Agreement attached as Exhibit 1 are materially identical to the terms of each Agreement entered into between Empower and each member of the Class.

203.   Plaintiff and each member of the Class performed their obligations under the Agreement by enrolling in Empower's Managed Account services.

204.   In each Class member's Agreement with Empower, Empower explicitly "acknowledge[d] that, as a registered investment adviser, it owe[d] a fiduciary duty to participants with respect to the advice it provides." Ex. 1 at 3.

205.   The Agreement also provided that, by purchasing the "Managed Account service" from Empower, members of the Class were purchasing the services of "investment professionals [who would] select among the available investment options and manage their retirement accounts for them." *Id.* at 1.

206.   Empower also promised in the Agreement that it would provide "personalized" investment advice tailored to the needs of Plaintiff and each member of the Class. *Id.* at 2.

207.   But in breach of its obligations under the Agreement with Plaintiff and each member of the Class, Empower put all assets over which Plaintiff and each member of the Class gave Empower discretionary authority when they purchased Managed Account services into one of seven preset asset allocations —in other words, Empower did not provide the "personalized," individualized investment advice it promised.

208.   And in breach of its obligations, Empower ensured that the seven pre-set asset allocations into which Class members' assets would be invested would be comprised in whole or in part of funds offered by Empower affiliates including EFS, which would therefore result in Empower affiliates taking conflicted fees from members of the Class.

209.   As a direct and proximate result of Empower's breach of the uniform contracts it entered into with Plaintiff and each member of the Class, Plaintiff and each member of the Class has suffered damages, including (but not limited to) the conflicted investment-advisory fees they paid to Empower and conflicted fund fees they paid to Empower's affiliates.

### COUNT EIGHT: Unjust Enrichment
### (against Empower, EFS, and EAIC)

210.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 110 as if they were fully set forth herein

211.   In the alternative to the breach of contract claim stated above, Empower has been unjustly enriched by its practice of misleading Plaintiff and members of the Class to purchase Managed Account services.

212.   Plaintiff and the Class members conferred a substantial benefit on Empower at their expense by paying investment-advisory fees to Empower based on Empower's misrepresentations that it was providing individualized investment advice to them and that it was acting as their fiduciaries.

213.   Under these circumstances, Empower would be unjustly enriched and it would be inequitable to permit Empower to retain the investment-advisory fees it took from Plaintiff and the members of the Class.

214.    Additionally, EAIC and EFS have been unjustly enriched as a result of the fund fees paid directly or indirectly to them from the assets of members of the Class.

215.   After misleading customers to purchase its Managed Account services, Empower took money from members of the Class ostensibly to pay fund fees (directly or indirectly) to its affiliates, including EFS and EAIC.

216.   Those funds fees conferred a benefit on EFS and its sole owner EAIC at the expense of members of the Class.

217.   Under these circumstances (including, but not limited to Empower's breach of fiduciary duty, fraud, and/or negligent misrepresentation, which resulted

in the payment of fund fees), EFS and EAIC would be unjustly enriched and it would be inequitable to permit EFS and EAIC to retain the fund fees Empower took from members of the Class and provided to EFS and EAIC.

218.   Among other relief, Plaintiff and members of the Class are entitled to an order disgorging Empower, EFS, and EAIC of all investment advisory fees and fund fees paid by Plaintiff and members of the Class.

## JURY TRIAL DEMANDED

219.   Under Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiff demands a trial by jury as to every fact or question triable of right by a jury. In the alternative, Plaintiff requests an advisory decision by jury on all issues not triable of right by a jury.

## PRAYER FOR RELIEF

220.   Plaintiff seeks entry of judgment on each of her claims and request that the Court order the following relief:

a)   The full payment of any and all compensatory damages suffered by Plaintiff and members of the Class as may be proven at trial;

b)   Pre-judgment interest on any and all compensatory damages amounts as may be proven at trial;

c)   Disgorgement of all investment-advisory and fund fees paid to

Defendants and/or their advisors;

d)      Exemplary or punitive damages as appropriate for the causes

of action alleged herein;

e)      Attorneys' fees, expenses, and costs; and

f)      Such other relief as the Court deems just and proper.

Respectfully submitted this 9th day of January, 2023.

/s/ Forrest James IV                         /s/ T. Brandon Waddell
Forrest James IV                             Michael A. Caplan
**FOB JAMES LAW FIRM, LLC**                  T. Brandon Waddell
2226 1st Ave South, Suite 105                **CAPLAN COBB LLC**
Birmingham, Alabama 35233                    75 Fourteenth Street, NE, Suite 2700
Phone: (205) 407-6009                        Atlanta, Georgia 30309
                                             (404) 596-5600 – Office
James Z. Foster                              (404) 596-5604 – Facsimile
**FOSTER LAW LLC**                           mcaplan@caplancobb.com
1201 West Peachtree St, NW, Suite            bwaddell@caplancobb.com
2300 Atlanta, Georgia 30309
Phone: (404) 800-0050

*Counsel for Plaintiff and the Proposed Class*